| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |
|---|---|

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| *versus* | § | CASE NO. 4:14-CR-91(17) |
| | § | |
| ROLANDO MUNIZ | § | |

## MEMORANDUM AND ORDER

Pending before the court is Defendant Rolando Muniz's ("Muniz") Motion for Compassionate Release (#942), wherein he requests that the court release him from imprisonment pursuant to 18 U.S.C. § 3582(c)(1)(A) due to the threat of Coronavirus Disease 2019 ("COVID-19"). The Government opposes the motion (#952). After conducting an investigation, United States Probation and Pretrial Services ("Probation") recommends denying the motion. Having considered the motion, the Government's response, Probation's recommendation, the record, and the applicable law, the court is of the opinion that the motion should be denied.

I.  Background

On March 30, 2016, Muniz pleaded guilty to Count 1 of the First Superseding Indictment, Conspiracy to Possess with the Intent to Manufacture and Distribute Cocaine, in violation of 21 U.S.C. § 846, pursuant to a non-binding plea agreement. Subsequently, on January 3, 2017, the court sentenced Muniz to 405 months' imprisonment, followed by a 5-year term of supervised release. The court ordered his sentence to run concurrently with the sentence imposed on him in Case No. 5:11-CR-675 in the Western District of Texas. On April 11, 2018, the court reduced Muniz's sentence to 180 months' imprisonment pursuant to Federal Rule of Criminal Procedure 35(b). Muniz previously filed a Motion for Compassionate Release in Case No. 5:11-CR-675 in the Western District of Texas, which Judge Fred Biery denied on December 17, 2020. Muniz is

currently being housed at Federal Correctional Institution Fairton, located in Fairton, New Jersey ("FCI Fairton"). His projected release date is April 26, 2027.

II.     Analysis

   A.     Exhaustion of Administrative Remedies

On December 21, 2018, former President Trump signed the First Step Act of 2018 into law. *See* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194. The Act, in part, amended 18 U.S.C. § 3582(c), which gives the court discretion, in certain circumstances, to reduce a defendant's term of imprisonment:

> The court, upon motion of the Director of the Bureau of Prisons ("BOP"), or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction; or the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g); and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A). This provision is commonly referred to as "compassionate release."

Prior to the First Step Act, only the Director of the BOP could file a motion seeking compassionate release. *See United States v. Franco*, 973 F.3d 465, 467 (5th Cir. 2020) ("Prior to the passage of the First Step Act . . . courts lacked the power to adjudicate motions for compassionate release."), *cert. denied*, ___ U.S. ___, No. 20-5997, 2020 WL 7132458 (Dec. 7, 2020); *Tuozzo v. Shartle*, No. 13-4897, 2014 WL 806450, at *2 (D.N.J. Feb. 27, 2014) (denying

2

petitioner's motion for compassionate release because no motion for his release was filed by the BOP).  The First Step Act amended § 3582(c) by providing a defendant the means to appeal the BOP's decision not to file a motion for compassionate release on the defendant's behalf.  *United States v. Cantu*, 423 F. Supp. 3d 345, 347 (S.D. Tex. 2019); *United States v. Bell*, No. 3:93-CR-302-M, 2019 WL 1531859, at *1 (N.D. Tex. Apr. 9, 2019).  The plain language of the statute, however, makes it clear that the court may not grant a defendant's motion for compassionate release unless the defendant has complied with the administrative exhaustion requirement.  18 U.S.C. § 3582(c)(1)(A); *Franco*, 973 F.3d at 467 (holding that the statutory requirement that a defendant file a request with the BOP before filing a motion for compassionate release in federal court "is *not* jurisdictional but that it *is* mandatory"); *United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020) ("Even though [the] exhaustion requirement does not implicate [the court's] subject-matter jurisdiction, it remains a mandatory condition."); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he exhaustion requirement . . . presents a glaring roadblock foreclosing compassionate release.").  Thus, before seeking relief from the court, a defendant must first submit a request to the warden of his facility to move for compassionate release on his behalf and then either exhaust his administrative remedies or wait for the lapse of 30 days after the warden received the request.  18 U.S.C. § 3582(c)(1)(A); *Franco*, 973 F.3d at 467 ("The text . . . outlines two routes a defendant's motion can follow to be properly before the court.  Both routes begin with the defendant requesting that 'the [BOP]' 'bring a motion on the defendant's behalf.'"); *United States v. Harris*, 812 F. App'x 106, 107 (3d Cir. 2020); *United States v. Springer*, 820 F. App'x 788, 791 (10th Cir. 2020) (defendant "was required to request that the BOP file a compassionate-release motion on his behalf to initiate his administrative

3

remedies" (citing *Raia*, 954 F.3d at 595)); *Alam*, 960 F.3d at 833-34; *United States v. Soliz*, No. 2:16-190-3, 2020 WL 2500127, at *3 (S.D. Tex. May 14, 2020) ("§ 3582(c)(1)(A) does not provide this Court with the equitable authority to excuse [defendant's] failure to exhaust his administrative remedies or to waive the 30-day waiting period." (quoting *United States v. Reeves*, No. 18-00294, 2020 WL 1816496, at *2 (W.D. La. Apr. 9, 2020))).

Here, on April 22, 2020, Muniz submitted an Inmate Request to Staff requesting compassionate release. Probation's investigation reveals that the BOP never replied to Muniz's request. Muniz submitted a second Inmate Request to Staff, dated August 18, 2020, again requesting compassionate release. On September 16, 2020, Warden Thomas E. Bergami denied Muniz's request, noting that he is 40 years old and does not have any debilitating medical conditions. Although Muniz complied with the exhaustion requirement before filing the instant motion, nothing in his motion indicates that extraordinary and compelling reasons exist to release him from confinement.

Congress did not define "extraordinary and compelling." Rather, it elected to delegate its authority to the United States Sentencing Commission ("the Commission"). *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."); *see also* U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 (U.S. SENTENCING COMM'N 2018) ("USSG"). In Application Note 1 to § 1B1.13 of the USSG, the Commission defined "extraordinary and compelling reasons" to include the following four categories of circumstances: (i) certain medical conditions of the defendant; (ii)

the defendant is 65 years or older and meets other requirements; (iii) the defendant's family has specified needs for a caregiver; and (iv) other reasons in the defendant's case that establish an extraordinary and compelling reason. The court must also consider the factors set forth in 18 U.S.C. § 3553(a),[1] as applicable, and find that the sentence modification is consistent with the policy statements issued by the Commission. 18 U.S.C. § 3582(c)(1)(A). The policy statement regarding compassionate release requires a determination that "the defendant is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2).

### B. Medical Condition

In the instant motion, Muniz contends that he is eligible for compassionate release due to his medical condition—specifically, that he has "Type 2 Diabetes, hyperlipidemia, and polyneuropathy." The USSG provides that extraordinary and compelling reasons exist regarding a defendant's medical condition when the defendant is "suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory)" or when a defendant is "suffering from a serious physical or medical condition," "suffering from a serious functional or cognitive impairment," or "experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the

---

[1] Section 3553(a) directs courts to consider: the nature and circumstances of the offense and the defendant's history and characteristics; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to deter criminal conduct; the need to protect the public; the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences and sentencing ranges established for defendants with similar characteristics under applicable USSG provisions and policy statements; any pertinent policy statement of the Commission in effect on the date of sentencing; the need to avoid unwarranted disparities among similar defendants; and the need to provide restitution to the victim. 18 U.S.C. § 3553(a).

environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt. n.1(A).

Here, according to his Presentence Investigation Report ("PSR"), prepared on June 14, 2016, and revised on November 28, 2016, Muniz informed Probation that he was diagnosed with diabetes in 2011 but was not receiving treatment. He also reported to Probation that he was taking blood pressure and cholesterol medications to aid with kidney functioning. The limited medical records provided by Muniz reveal that his polyneuropathy is in remission. Muniz's recent BOP medical records, provided by the Government, indicate that he has been diagnosed with Type 2 diabetes, hyperlipidemia, vitamin D deficiency, an inguinal hernia, a urethral stricture, and an enlarged prostate. He is currently prescribed atorvastatin to control his cholesterol, finasteride to treat his prostrate problems, lisinopril to control his blood pressure, metformin to treat his diabetes, tamsulosin for urinary retention, and cholecalciferol for his vitamin D deficiency. During a January 10, 2020, medical encounter, Abigail Lopez de Laselle, M.D. ("Dr. Lopez de Laselle"), noted that Muniz "has a nonchalant attitude towards treatment recommendations." On January 24, 2020, Dr. Lopez de Laselle again commented on Muniz's noncompliance with his medical treatment and regimen.

In his motion, Muniz claims that he "was denied essential diabetes medication further causing damage to his body and health." Muniz's medical records, however, reflect that, for a period of time, he was not on medication for diabetes because his A1c levels were below 6.4, meaning that he was not considered diabetic.[2] On March 26, 2019, Muniz's A1c level was 6.1.

---

[2] A hemoglobin A1c test is a method for measuring blood sugar. According to the Centers for Disease Control and Prevention ("CDC"), a normal A1c level is below 5.7%, a level of 5.7% to 6.4% indicates prediabetes, and a level of 6.5% or more indicates diabetes.

On June 10, 2019, M. Alexander, A.R.N.P., decreased Muniz's dosage of metformin, a medication used to treat diabetes, because his A1c level had dropped from 6.7 to 6.1. On July 10, 2019, Dr. Lopez de Laselle noted that Muniz's A1c level remained at 6.1, discontinued his metformin prescription, and indicated that "[i]f he continues pre-diabetic, then continue to manage with life style modification ONLY." A medical record dated July 24, 2019, prepared by Denise Rodriguez, A.P.N./N.P., states that Muniz "was reportedly not consistent with taking oral hypoglycemics[,] so this medication was recently discontinued as he remained in the 'prediabetic' range." On December 2, 2019, after test results showed an A1c level of 6.9, Muniz was again prescribed metformin to treat his diabetes. Muniz's medical records dated January 7, 2021, indicate that he had an A1c level of 8.5, up from 8.1 on September 30, 2020, and 7.0 on January 14, 2020. On October 13, 2020, in accordance with his elevated A1c levels, medical staff increased Muniz's dosage of metformin. Thus, the BOP appears to be monitoring and treating Muniz's diabetes appropriately.

Muniz also complains that he "underwent surgery to remove a toe." On November 5, 2019, Muniz submitted an Inmate Sick Call Sign-up Sheet informing BOP staff that he had an "open sore on [his] foot with discharge drainage." On November 7, 2019, medical staff examined and cleaned the open wound and ordered daily wound care. Muniz did not report for wound care on November 16, 2019. On November 20, 2019, after attempting to treat the infection for two weeks with a variety of medications, medical staff amputated the infected toe. Christopher Struby, D.O., noted that Muniz's infection "has likely been going on for a while." As of March 11, 2020, Muniz's toe incision had healed "with mild to moderate hyperpigmentation."

Muniz is classified as a BOP medical Care Level 2 inmate. According to the BOP's Clinical Practice Guidelines, dated May 2019, Care Level 2 inmates "are stable outpatients who require clinician evaluations monthly to every 6 months. Their medical . . . conditions can be managed through routine, regularly scheduled appointments with clinicians for monitoring. Enhanced medical resources, such as consultation or evaluation by medical specialists, may be required from time to time." Therefore, Muniz's medical summary does not meet the criteria listed above. None of his reported medical conditions are terminal or substantially diminish his ability to provide self-care. *See United States v. Thompson*, 984 F.3d 431, 433 (5th Cir. 2021) (affirming the denial of compassionate release and noting that the defendant's medical conditions did not diminish his ability to care for himself). The court acknowledges that according to the CDC website, some of Muniz's underlying medical conditions place him at a higher risk of severe symptoms should he contract COVID-19; nonetheless, such commonplace maladies do not make Muniz's case "extraordinary." *See id*. at 434. According to the CDC, 34.2 million people in the United States, approximately 10.5% of the population, have diabetes and approximately 12% of the population has hyperlipidemia (high cholesterol). Due to their prevalence, diabetes and hyperlipidemia cannot be deemed "extraordinary" in order to merit compassionate release. *See Id*. (noting that neither hypertension nor high cholesterol made the defendant's case "extraordinary" because "nearly half of the adult population in the United States suffers from hypertension" and "roughly 12% of Americans suffer from high cholesterol"); *United States v. Williams*, No. CR 15-83-SDD-EWD, 2021 WL 414825, at *3 (M.D. La. Feb. 5, 2021) (denying compassionate release to inmate with type 2 diabetes and obesity because there was no evidence these conditions had diminished his ability to provide self-care within the facility); *United States*

8

*v. Cotto*, No. CV 16-36, 2020 WL 5761192, at *2 (E.D. La. Sept. 28, 2020) (recognizing the seriousness of diabetes and obesity but denying compassionate release because the inmate had not shown that he was unable to take care of himself within the confines of the facility or that BOP could not manage his medical conditions appropriately in view of medical records showing he was being administered the necessary care); *United States v. Dressen*, No. 4:17-CR-40047-01-KES, 2020 WL 5642313, at *3 (D.S.D. Sept. 22, 2020) (denying compassionate release because the defendant did not identify "how his Type 2 diabetes prevents him from providing self-care in a correctional facility setting or how it amounts to extraordinary and compelling circumstances"); *United States v. Jeffers*, 2020 WL 3100842, at *6-7 (N.D. Iowa June 11, 2020) (finding that the defendant had not demonstrated extraordinary and compelling circumstances when his diabetes and hypertension were controlled, monitored, and managed by the BOP). In fact, Muniz's BOP records reveal that he is housed in general population, has no medical restrictions, has regular duty work assignments, is cleared for food service, and currently works in the kitchen. Thus, Muniz has failed to establish that a qualifying medical condition exists that would constitute an extraordinary and compelling reason to reduce his sentence.

    C.    "Other" Reasons

Muniz's request for compassionate release potentially falls into the fourth, catch-all category of "other" extraordinary and compelling reasons, which specifically states that the Director of the BOP shall determine whether "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 cmt. n.1(D). Although Subdivision D is reserved to the BOP Director, the Commission acknowledged, even before the passage of the First Step Act, that

9

courts are in the position to determine whether extraordinary and compelling circumstances are present. *United States v. Beck*, 425 F. Supp. 3d 573, 583 (M.D.N.C. 2019) ("Read in light of the First Step Act, it is consistent with the previous policy statement and with the Commission guidance more generally for courts to exercise similar discretion as that previously reserved to the BOP Director in evaluating motions by defendants for compassionate release."); *see Cantu*, 423 F. Supp. 3d at 352 ("[T]he correct interpretation of § 3582(c)(1)(A) . . . is that when a defendant brings a motion for a sentence reduction under the amended provision, the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) warrant granting relief.").

In the case at bar, there is no indication that the BOP Director made a determination regarding the presence of extraordinary and compelling reasons with respect to Muniz for any "other" reason. It is well settled that "compassionate release is discretionary, not mandatory." *United States v. Chambliss*, 948 F.3d 691, 693 (5th Cir. 2020). Where, as here, a prisoner has engaged in severe criminal conduct and has an extensive criminal history, the district court has the discretion to deny compassionate release after weighing the evidence. In exercising its discretion, the court finds that no extraordinary and compelling reasons exist in relation to Muniz's situation. Nonetheless, Muniz maintains that his post-sentence rehabilitation, evidenced by a list of courses and programs he has completed, establishes extraordinary and compelling reasons for compassionate release. While the court may consider rehabilitation efforts, "rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B1.13 cmt. n.3; *accord* 28 U.S.C. § 994(t); *see United States v. Brooker*, 976 F.3d 228, 237-38 (2d Cir. 2020) (holding that a district court's discretion in

10

sentencing is broad; however, there is a "statutory limit on what a court may consider to be extraordinary and compelling . . . [and] '[r]ehabilitation . . . alone shall not be considered an extraordinary and compelling reason.'" (quoting 28 U.S.C. § 994(t))); *United States v. Hudec*, No. CR 4:91-1-1, 2020 WL 4925675, at *5 (S.D. Tex. Aug. 19, 2020) ("While the Court is permitted to consider post-sentencing rehabilitation in determining whether to grant an eligible defendant a sentence reduction, it is not authorized to grant a reduction based upon post-sentencing rehabilitation alone."); *cf. United States v. Whitehead*, 986 F.3d 547, 551 (5th Cir. 2021) (upholding the denial of a sentence reduction from a life sentence and finding that the court may, but is not required, to consider a defendant's post-conviction rehabilitative efforts when evaluating a motion for reduction under § 404 of the First Step Act).

Muniz maintains that if he contracts COVID-19 it will be fatal for him due to prison overcrowding and there being no way to distance himself from other inmates. Nevertheless, as of March 12, 2021, the figures available at www.bop.gov list 1 inmate (out of a total inmate population of 883) and 34 staff members at FCI Fairton as having confirmed positive cases of COVID-19, 275 inmates and 17 staff members who have recovered, and 1 inmate who has succumbed to the disease. Thus, it appears that the facility where Muniz is housed is handling the outbreak appropriately and providing adequate medical care.

Although Muniz expresses legitimate concerns regarding COVID-19, he does not establish that the BOP cannot manage the outbreak within his correctional facility or that the facility is specifically unable to treat Muniz, if he were to contract the virus and develop COVID-19 symptoms, while incarcerated. *See Thompson*, 984 F.3d at 435 ("Fear of COVID doesn't automatically entitle a prisoner to release."); *Raia*, 954 F.3d at 597 ("[T]he mere existence of

11

COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."); *United States v. Banks*, No. CR 15-0080-02, 2020 WL 6839267, at *4 (W.D. La. Nov. 20, 2020) ("This Court cannot equate the generalized fear of COVID-19 to an extraordinary and compelling reason to support compassionate release, nor will it undermine BOP's criteria to determine eligibility for sentence reductions or home confinement."); *United States v. Woods*, No. 4:11-CR-106-SDJ, 2020 WL 6391591, at *4 (E.D. Tex. Nov. 2, 2020) (noting that "courts have concluded that an inmate's concerns about risks associated with the spread of COVID-19 are not consistent with the policy statement of the Commission as required by Section 3582(c)(1)(A)"); *United States v. Vasquez*, No. CR 2:18-1282-S-1, 2020 WL 3000709, at *3 (S.D. Tex. June 2, 2020) ("General concerns about the spread of COVID-19 or the mere fear of contracting an illness in prison are insufficient grounds to establish the extraordinary and compelling reasons necessary to reduce a sentence." (quoting *United States v. Koons*, 455 F. Supp. 3d 285, 292 (W.D. La. 2020))); *United States v. Clark*, 451 F. Supp. 3d 651, 656 (M.D. La. 2020) (finding the defendant had failed to present extraordinary and compelling reasons to modify his prison sentence because he "does not meet any of the criteria set forth by the statute" and he "cites no authority for the proposition that the fear of contracting a communicable disease warrants a sentence modification"). Furthermore, contracting the virus while incarcerated, even in conjunction with preexisting health conditions, is insufficient to establish exceptional and compelling circumstances warranting compassionate release. *See United States v. Jackson*, No. 3:16-CR-196-L-1, 2020 WL 4365633, at *2 (N.D. Tex. July 30, 2020) (finding that defendant had failed to present extraordinary and compelling reasons for

compassionate release despite suffering from previous underlying health conditions and testing positive for COVID-19). Therefore, Muniz has failed to establish that a qualifying medical condition or other reasons exist that would constitute extraordinary and compelling reasons to warrant his release from imprisonment.

D.     Section 3553(a) Factors

The court further finds that compassionate release is not merited in light of the applicable factors set forth in § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A) (requiring courts to consider the § 3553(a) factors before granting compassionate release); *Thompson*, 984 F.3d at 435 n.11 (collecting cases); *Chambliss*, 948 F.3d at 693-94. Muniz's offense of conviction entails his participation in a large-scale, international drug-trafficking conspiracy involving the distribution of between 150 and 450 kilograms of cocaine. The charges stem from an investigation in which numerous members of the Los Zetas Drug Trafficking Cartel, operating in the United States and Mexico, were identified through the use of wire intercepts, surveillance, confidential sources, and record analysis. The investigation revealed that several high-level members of the Los Zetas were operating out of the Dallas, Texas, area and had a network of other individuals conspiring to smuggle, transport, and distribute cocaine, as well as bulk quantities of cash, in other Texas cities. As part of the conspiracy, Muniz was a source of supply operating out of San Antonio, Texas, who provided coconspirators with kilogram quantities of cocaine from various sources for distribution to others in the Eastern and Northen Districts of Texas. Muniz served as a source of supply and facilitator of the distribution of between 30 and 150 kilograms of cocaine in the San Antonio area as part of his leadership role in the Texas Syndicate prison gang. In that role, Muniz engaged in racketeering activities and authorized acts of violence. During the investigation, law

enforcement discovered that Muniz typically received 20 kilograms of cocaine and 6 kilograms of black tar heroin per week for distribution in the San Antonio area. Overall, Muniz was held responsible for possessing with intent to manufacture and distribute at least 310 kilograms of cocaine and 6 kilograms of heroin.

Muniz has an extensive criminal history, including prior convictions for failure to stop and give information, possession of marijuana, driving without a license, driving while intoxicated (3), assault causing bodily injury family member, and conspiracy to conduct affairs of an enterprise through a pattern of racketeering. Muniz's racketeering conviction stems from his activities connected to the Texas Syndicate prison gang. Muniz led meetings where members discussed committing crimes of violence and engaging in drug transactions. Muniz was directly involved in a conspiracy to murder a fellow Texas Syndicate member. Although the gang member survived, the plot led to the murder of the intended victim's sister-in-law and serious bodily injury to the intended victim's brother.

Moreover, Muniz has a history of substance abuse. In his PSR, Muniz reported that he used alcohol regularly, marijuana daily, and cocaine weekly. He has a medium security risk classification and has been assessed as a medium risk for recidivism. In view of the circumstances surrounding his offense of conviction, his criminal history, and his history of substance abuse, the court cannot conclude that Muniz would not pose a danger to any other person or to the community, if released from prison at this time.

In addition, granting Muniz compassionate release would fail to provide just punishment for his offense and promote respect for the law. In *Chambliss*, the United States Court of Appeals for the Fifth Circuit upheld the denial of compassionate release due to the defendant's not yet

having served a sufficient portion of his sentence. *Id.* at 694. The district court determined that the defendant's terminal illness "constitut[ed] 'an extraordinary and compelling reason for a sentence reduction' and that he '[did] not present a danger upon release,'" but denied release because "releasing [the defendant] after serving only 14 years of a 30-year sentence minimizes both the impact of [the defendant's] crime and seriousness of the offense." *Id.* at 693-94. "Moreover, the [district] court, citing the § 3553(a) factors, determined that requiring [the defendant] to serve the remainder of his sentence would 'provide just punishment for the offense' and 'afford adequate deterrence to criminal conduct.'" *Chambliss*, 948 F.3d at 693-94; *see Thompson*, 984 F.3d at 434-35 (observing that the courts that have granted compassionate release "largely have done so for defendants who had already served the lion's share of their sentences and presented multiple, severe, health concerns"). In the instant case, releasing Muniz after he has served only 108 months (or approximately 60%) of his 180-month sentence would similarly minimize the impact of his crime and the seriousness of his offense.

E.  Home Confinement

In his motion, Muniz requests that the court release him to "home confinement." The BOP, however, has the exclusive authority to determine where a prisoner is housed; thus, the court is without authority to order home confinement. 18 U.S.C. § 3621(b); *Cheek v. Warden of Fed. Med. Ctr.*, 835 F. App'x 737, 739 (5th Cir. 2020) (holding that "the pandemic did not create judicial authority to grant home confinement"); *United States v. Donnell*, 476 F. Supp. 3d 514, 522 (E.D. Tex. 2020); *Ambriz v. United States*, 465 F. Supp. 3d 630, 633 (N.D. Tex. 2020); *United States v. Miller*, No. 2:17-CR-015-D (02), 2020 WL 2514887, at *1 (N.D. Tex. May 15, 2020) ("[N]either the CARES Act nor the First Step Act authorizes the court to release an inmate

15

to home confinement."). Indeed, "[n]o inmate has a constitutional right to be housed in a particular place or any constitutional right to early release." *Cheek*, 835 F. App'x at 740. "It is not for a court to step in and mandate home confinement for prisoners, regardless of an international pandemic." *Id*.

Furthermore, the BOP has instituted a comprehensive management approach that includes screening, testing, appropriate treatment, prevention, education, and infection control measures in response to COVID-19. In response to a directive from the former United States Attorney General in March 2020, the BOP immediately began reviewing all inmates who have COVID-19 risk factors, as described by the CDC, for the purpose of determining which inmates are suitable for placement on home confinement. *See United States v. Collins*, No. CR 04-50170-04, 2020 WL 1929844, at *3 (W.D. La. Apr. 20, 2020). The BOP notes that inmates need not apply to be considered for home confinement, as this is being done automatically by case management staff. Since March 26, 2020, the BOP has placed 22,786 inmates on home confinement. The March 2020 directive is limited to "eligible at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities." *United States v. Castillo*, No. CR 2:13-852-1, 2020 WL 3000799, at *3 (S.D. Tex. June 2, 2020).

In his Memorandum to the BOP dated March 26, 2020, former Attorney General Barr acknowledges that the Department of Justice ("DOJ") has an obligation to protect both BOP personnel and inmates. He also notes that the DOJ has the responsibility of protecting the public, meaning that "we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19 or put the public at risk in other ways." The Attorney

16

General issued a subsequent Memorandum to the BOP on April 3, 2020, in which he emphasizes that police officers protecting the public face an increased risk from COVID-19 and cannot avoid exposure to the virus, with their numbers dwindling as officers who contract the virus become ill or die or need to recover or quarantine to avoid spreading the disease. Accordingly, he cautions:

> The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates.

As the court noted in *United States v. Preston*, "[t]he best predictor of how [Defendant] will behave if he were to be released is how he behaved in the past, and his track record is a poor one." No. 3:18-CR-307-K, 2020 WL 1819888, at *4 (N.D. Tex. Apr. 11, 2020) (quoting *United States v. Martin*, 447 F. Supp. 3d 399, 403 (D. Md. 2020)). Here, Muniz's track record is similarly a poor one. There is no reason to believe that Muniz would not revert to his racketeering and drug-dealing activities if released from prison at this time.

III.  Conclusion

In short, Muniz has failed to satisfy his burden of showing the necessary circumstances to warrant relief under the statutory framework to which the court must adhere. *See United States v. Dodge*, No. 17-323-01, 2020 WL 3668765, at *5 (W.D. La. July 6, 2020) (stressing that "the rampant spread of the coronavirus and the conditions of confinement in jail, alone, are not sufficient grounds to justify a finding of extraordinary and compelling circumstances"); *Koons*, 455 F. Supp. 3d at 291-92 (same). As the court observed in *Koons*, rejecting the notion that it has "carte blanche" authority to release whomever it chooses, "[t]he Court cannot release every

prisoner at risk of contracting COVID-19 because the Court would then be obligated to release every prisoner." *Dodge*, 2020 WL 3668765, at *6; *Koons*, 455 F. Supp. 3d at 292.

Consistent with the foregoing analysis, Muniz's Motion for Compassionate Release (#942) is DENIED.

SIGNED at Beaumont, Texas, this 12th day of March, 2021.

Marcia A. Crone
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE